## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

HENRY TANYIKE

     *Plaintiff,*

v.

UNITED STATES OF AMERICA

     *Defendant.*

Case No. 3:21-cv-00311

District Judge Thomas M. Rose

Magistrate Judge Peter B. Silvain, Jr.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE OR, IN THE ALTERNATIVE, TO DISMISS FOR IMPROPER VENUE

---

### INTRODUCTION

Plaintiff Henry Tanyike, a resident of Dayton, Ohio filed this civil rights action under the Federal Tort Claims Act ("FTCA") after Immigration and Customs Enforcement ("ICE") officers assaulted and choked him without provocation. Compl. ¶¶ 13-15, ECF No. 1. Defendant United States of America now moves to transfer this case to the Western District of Louisiana, arguing that Mr. Tanyike's immigration status precludes him from establishing residency in Ohio and that prudential factors warrant transfer. *See* ECF No. 10.

Defendants' primary argument, that all noncitizens who are not Lawful Permanent Residents ("LPRs") have no home venue for the purposes of 28 U.S.C. § 1402(b), defies that statute's plain language and Congress' intent, as other district courts have made clear. As Mr. Funaya's asylum case is pending before the Board of Immigration Appeals ("BIA"), he is lawfully present in the United States and therefore resides in Ohio.

1

Likewise, Defendant has not met its burden to demonstrate that discretionary transfer is warranted. Mr. Tanyike resides here, as do his witness brother-in-law and sister and the doctor who examined him shortly after his release from immigration detention. While litigating in this district would cost the United States, with its 6.82 trillion dollar annual budget, relatively little, transfer would burden Mr. Tanyike with the serious financial costs of litigating in Louisiana and emotional costs of forcing him to return to the site of the attacks that caused his Post Traumatic Stress Disorder ("PTSD"). As such, the Court should deny Defendant's motion.

## STATEMENT OF FACTS

On June 4, 2019, after fleeing political persecution from the Cameroonian government, Mr. Tanyike presented himself to U.S. Customs and Border Protection ("CBP") officials at the San Ysidro port of entry and requested asylum. ECF No. 1 ¶9. CBP transferred Mr. Tanyike to Immigration and Customs Enforcement ("ICE") custody at Winn Correctional Center ("WCC") in Winnfield, Louisiana. *Id*. On January 14, 2021, WCC guards brought Mr. Tanyike to a room where six ICE officials were waiting for him. *Id*. ¶¶10-13.

After the ICE officials demanded that Mr. Tanyike provide his signature and fingerprint on a document, he replied that he would be killed if he returned to his country, and that he wanted to show the document to his attorney. *Id*. ¶14. In response the officials grabbed Mr. Tanyike and tripped him, causing him to fall face first into the ground. *Id*. One officer pulled his head forward while others grabbed and pressed down on his neck and back. *Id*. ¶15. Even though Mr. Tanyike told them that he could not breathe, they continued to suffocate him for approximately two minutes until they handcuffed him behind his back, took his finger, bent it back, and then forcibly fingerprinted him. *Id*.

In the aftermath of the attack, Mr. Tanyike became fearful and sleepless, constantly experiencing intrusive thoughts and nightmares that the officers would come back and beat him again. *Id*. ¶23. The attack caused severe pain in his finger, ankles, knee, back, and waist. *Id*. Mr. Tanyike then tested positive for COVID-19 on February 3, 2021, which caused him to experience coughing, headaches, difficulty breathing, loss of appetite, joint pain, ear pain, and body weakness. *Id*. Mr. Tanyike reported these symptoms to his sister and brother-in-law shortly after the attack and continued to stay in touch with them regarding his post-attack symptoms and hardships. *See* Ex. 1, Declaration of Henry Tanyike ¶ 3.

After ICE released Mr. Tanyike, he went to live with his sister and brother-in-law in Dayton, Ohio, where he continues to reside today. *Id*. Mr. Tanyike received his Employment Authorization Document from the Department of Homeland Security ("DHS") and his social security card from the Social Security Administration ("SSA") in November of 2021 and his drivers' license from the state of Ohio in January of 2022. *See* Ex. 2, Identification Cards of Mr. Tanyike. As he is currently unemployed, Mr. Tanyike's sister and brother-in-law provide him with lodging, food, and transportation. *See* Tanyike Decl. ¶4. Mr. Tanyike's asylum case is currently pending before the Board of Immigration Appeals. *See* Order Granting Motion to Remand, *Tanyike v. Garland*, No. 20-73452, ECF No. 40 (9th Cir. Dec. 22, 2021). DHS does not consider those who await administrative adjudication their asylum claims, like Mr. Tanyike, to be unlawfully present in the United States.[1]

In March of 2022, Dr. Joan Lederer evaluated Mr. Tanyike and diagnosed him with Post Traumatic Stress Disorder ("PTSD"). *See* Ex. 3, Psychiatric Report Regarding Henry Tanyike.

---

[1] *See* Donald Neufeld, USCIS Acting Assoc. Director, *et al., Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(1) of the Act,* 29, May 6, 2009 ("Neufeld Memo"), *available at* http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/revision_redesign_AFM.PDF.

To this day, Mr. Tanyike's PTSD causes him constant insomnia, fearfulness and intrusive thoughts. ECF No. 1 ¶22. Dr. Lederer notes that Mr. Tanyike's potential return to Louisiana could trigger a fight or flight response caused by hois PTSD. Ex. 4 at 3..

## LEGAL STANDARD

Defendant claims that Mr. Tanyike lacks statutory authority to choose his venue. In such cases, the plaintiff bears the burden to establish that the venue is proper in the chosen district, but a court must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor. *See Olin-Marquez v. Arrow Senior Living Mgmt., LLC,* No. 2:21-CV-996, 2022 WL 479781, at *9-10 (S.D. Ohio Feb. 17, 2022). At the motion to dismiss stage, a plaintiff need only demonstrate a *prima facie* showing that the venue is proper. *Id*. Defendant also seeks discretionary transfer pursuant to 28 U.S.C. § 1404(a). In these cases, the defendant bears the burden of establishing that the existing forum is inconvenient. *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 492 (6th Cir. 2016).

## ARGUMENT

### I.     Mr. Tanyike Resides in and is Domiciled in This District.

Defendant argues that Mr. Tanyike has no domicile within the United States because he is not a LPR. ECF No. 10 at 4-9. However, noncitizens can establish venue in the judicial district where they are domiciled regardless of LPR status. Mr. Tanyike is domiciled in this district per the plain text and legislative history of 28 U.S.C. § 1391(c).

Federal tort actions against the United States, "may be prosecuted only in the judicial district where the plaintiff resides or [where the act occurred]." 28 U.S.C. § 1402(b). Generally, plaintiffs may sue the United States "in any judicial district in which . . . the plaintiff resides . . ." 28 U.S.C. § 1391(e)(1)(C). "Residence" in both statutes is defined by 28 U.S.C. § 1391(c)(1),

4

which states that "a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled." *Id.* § 1391(c)(1).

**A.  The Plain Language of 28 U.S.C. § 1391 Allows Mr. Tanyike to Sue in This District.**

Mr. Tanyike is a "natural person" within the meaning of § 1391(c)(1) as a "natural person" is simply "an individual." *See Mohamad v. Palestinian Authority*, 566 U.S. 449, 454 (2012). Because "the words of the statute are unambiguous, the judicial inquiry is complete," and Mr. Tanyike can establish venue here. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (internal quotation marks omitted).

Defendant argues that the phrase "including an alien lawfully admitted for permanent residence" limits the scope of § 1391(c)(1) to LPRs alone. *See* ECF No. 10 at 4. However, the Supreme Court has repeatedly rejected attempts to construe "including" as categorically excluding unnamed groups, finding instead that it means that the statute is "not limited to the examples that follow that word." *West v. Gibson*, 527 U.S. 212, 218 (1999); *see also Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 189 (1941) (Finding that the word "including" in a statute allowing the National Labor Relations Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act" did not limit the agency's authority to take other non-enumerated actions); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 132–33 (2012) ("The verb to include introduces examples, not an exhaustive list."). Indeed, elsewhere in Title 28, Congress used the word "including" in just this manner. For example, in 28 U.S.C. § 528, Congress provided for rules "requir[ing] the disqualification of any officer or employee of the Department of Justice, *including* a United States attorney or member of such attorney's staff" from certain

5

investigations. (emphasis added). However, those rules also apply to other Department of Justice employees such as the Attorney General. *See In re Grand Jury Subpoena of Rochon*, 873 F.2d 170, 175 (7th Cir. 1989). As a "basic canon of statutory construction that identical terms within an Act bear the same meaning," the use of "including" in 28 U.S.C. § 1391(c)(1) must also be interpreted as non-exhaustive. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992). As the meaning of "including" in this statute is clear on the statute's face, this court need not reach the legislative history of the amendments. *Ex parte Collett,* 337 U.S. 55, 61 (1949).

Indeed, multiple courts have concluded that the phrase "including an alien lawfully admitted for permanent residence" § 1391(c)(1) is an illustrative, rather than limiting example. First, in *Alvarado v. United States*, one district court reasoned that because the statute's language unambiguously includes all "natural persons," "[t]he plain text of 1391(c)(1) authorizes all non-citizens—regardless of LPR status—to establish residency where they are domiciled." No. CV 16-5028, 2017 WL 2303758, at *2 (D.N.J. May 25, 2017). Similarly, in *Flores v. United States*, the court found that the statute was "unambiguous on its face" and that "[a]lienage is not a reason stated in the statute as a basis for finding persons outside its reach." 108 F. Supp. 3d 126, 131 (E.D.N.Y. 2015). Consequently, both the *Alvarado* and *Flores* courts ruled that the non-LPR plaintiffs in those cases could bring their FTCA claims in their home districts. *Id*. at 131; *Alvarado*, 2017 WL 2303758, at *2-3. Likewise, a multitude of courts have assumed that a non-LPR noncitizen's home district is an appropriate venue. *See e.g. Adrianza v. Trump*, 505 F. Supp. 3d 164, 174 (E.D.N.Y. 2020) (Noncitizen subject to removal could sue in his home district); *Rasool v. Mayorkas*, No. 1:21-CV-02367 (TNM), 2021 WL 5492976, at *1 (D.D.C. Nov. 23, 2021) (asylum applicant); *Doe v. United States*, No. 3:16-CV-0856, 2017 WL 4864850, at *1 (M.D. Tenn. Oct. 26, 2017) (asylum applicants); *Chakrabarti v. United States Citizenship*

& *Immigr. Servs.*, No. CV 21-1945 PJM, 2021 WL 4458899, at *2 (D. Md. Sept. 29, 2021)

(employment based nonimmigrants); *N-N v. Mayorkas*, No. 19-CV-5295(EK), 2021 WL

1997033, at *1, 6 (E.D.N.Y. May 18, 2021) (U nonimmigrant status petitioner). As such, the

plain language reading of the statute makes clear that Mr. Tanyike is a resident of this district.

**B.  Canons of Statutory Construction Favor Interpreting 28 U.S.C. § 1391 to Not Limit Residency for Venue Purposes to LPRs.**

Defendant argues that the legislative history of 28 U.S.C. § 1391 makes clear that only

LPRs can be residents of a particular district. *See* ECF No. 10 at 4-8. However, the 2011

amendments to 28 U.S.C. § 1391 cited by Defendant primarily serve to establish domicile as the

defining feature of residence for venue purposes. Through these amendments, Congress sought

to resolve an existing circuit split over whether "residence" should be equated with "domicile."

H.R. Rep. 112-10, at 20-21 (2011).

Specifically, Congress made two changes affecting noncitizens. First, Congress revised

28 U.S.C. § 1391(c)(3) to focus on domicile, making changes "shifting the focus from 'alienage'

of a defendant to whether the defendant has his or her 'residence' outside the United States."  *See*

H.R. Rep. 112-10, at 22. Indeed, the amendments make clear that even "United States citizens

domiciled abroad could not claim a venue defense to the location of litigation" *Id*. As such, the

operative analysis when determining residence is whether the party can form the requisite intent

to remain.

Second, Congress in the 2011 amendments added the phrase "including an alien lawfully

admitted for permanent residence" in order to limit venue defenses to those who could "form the

intent to remain in this country indefinitely." *Id*. at 23 n.16. In so amending, Congress legislated

with knowledge that certain noncitizens without LPR status could form intent to remain and even

cited Seventh Circuit decision holding that LPR status is not a prerequisite to establishing

domicile. *Id*. (*citing Castellon-Contreras v. I.N.S.*, 45 F.3d 149 (7th Cir. 1995)). In *Castellon-Contreras*, the court concluded that domicile turns on an individual's capacity to form a lawful intent to remain. 45 F.3d at 153-54 ("In order to have a 'lawful domicile,' . . . an alien must have the ability, under the immigration laws, to form the intent to remain in the United States indefinitely. . . . aliens can become lawful domiciliaries without first obtaining LPR status."); *accord White v. I.N.S.*, 75 F.3d 213, 215 (5th Cir. 1996) (same); *Lok v. I.N.S.*, 548 F.2d 37, 40 (2d Cir. 1977) (holding that LPR status was not necessary to establish "lawful domicile.")

Defendant argues that "courts had long held that noncitizens—including lawful permanent residents—could not establish any domicile in the United States for purposes of venue." ECF No. 10 at 4-5. However, not only have many pre-2011 courts found that noncitizens may establish domicile, Defendant also relies on cases which are far from unequivocal on the domicile issue. First, Defendants cite *Galveston, H. & S.A. Ry. Co. v. Gonzales*, 151 U.S. 496, (1894), which states in dicta that a noncitizen is "assumed not to reside in the United States" and "must resort to the domicile of the defendant."151 U.S. 496, 506-07 (1894). However, the Court in that case, which concerned whether noncitizens have a right to bring suits in United States courts at all, found that a person "might be an inhabitant, without being a citizen; and a citizen might not be an inhabitant, though he retain his citizenship. Alienage or citizenship is one thing; and inhabitancy, by which I understand local residence, animo manendi, quite another." *Id*. at 501. Second, the Defendant cites *Arevalo-Franco v. INS,* in which the court found that the noncitizen plaintiff could actually bring his FOIA case in his home venue. 889 F.2d 589, 590 (5th Cir. 1990). Finally, Defendant cites *Williams v. United States*, but the court in that case explicitly leaves open the question of whether noncitizens can avail themselves of favorable venue provisions. 704 F.2d 1222, 1227 (11th Cir. 1983) ("If the court finds that Williams is a

non-resident alien taxpayer, it must consider the difficult constitutional question of whether the government may constitutionally raise improper venue to bar a non-resident alien taxpayer from use of the jeopardy assessment review procedures.").

Defendant also cites *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018), a case deciding whether a foreign corporation domiciled abroad could mount a venue defense. The court there held that the amendment was a "modest adjustment limited to natural persons," that did not affect established case law regarding venue for foreign corporations. *Id.* at 1356, 1358–60. The dicta in that case stated that 2011 amendments applied to immigrants with "permanent resident status," but it did not analyze that issue, and the dicta was irrelevant to the case's holding. *See Coyoy v. United States*, 526 F. Supp. 3d 30, 41 n.11 (D.N.J. 2021) (Finding that *HTC* did not apply where the government challenged venue in a FTCA case brought by an asylum applicant). Indeed, almost every court that has actually analyzed the statute have found that Congress intended to allow noncitizens to raise venue defenses if they could establish intent to remain and that the phrase "including an alien lawfully admitted for permanent residence" used LPRs as an illustrative rather than limitative example. *Id.* at 41 (a "person who *is* capable of forming such an intent may, consistent with Congress's intent, be eligible to be considered a "resident" within the meaning of 28 U.S.C. §§ 1391(c)(1) and 1402(a)"); *Alvarado*, 2017 WL 2303758 at *3 at *6–7 ("Here, the general principle is that 'natural persons' can establish residency where they are domiciled, and individuals with LPR status are merely an illustrative example of natural persons."); *Luna v. United States*, No. C20-1152RSL, 2021 WL 673534, at *2 (W.D. Wash. Feb. 22, 2021).[2]

---

[2] Defendant also cites *Najera v. United States*, No. 1:16CV459 (JCC/JFA), 2016 WL 6877069 (E.D. Va. Nov. 22, 2016), but no court has followed *Najera* with at least two courts explicitly disregarding its conclusions. *See Alvarado*, 2017 WL 2303758, at *5*; *Coyoy*, 526 F. Supp. 3d at 41 n.11. *Blacher v. Ridge*, 436 F. Supp. 2d 602, 605 (S.D.N.Y. 2006), also relied upon by Defendant, involves a visa petitioner who does not fall within DHS' unlawful presence exception for asylum seekers, as Mr. Tanyike does here.

Defendant argues that reading the statute to allow non-LPR noncitizens a choice of venue would render the word "including" superfluous. ECF No. 10 at 8 n. 5. However, as discussed in subsection A, *supra*, Congress use of the word "including" is clear: to denote that examples, rather than an exclusive list will follow.

Congress knows how to limit the application of a statute by using limiting phrases such as "only if," "limited to," or "means." *See generally Helvering v. Morgan's, Inc*., 293 U.S. 121, 126 n.1(1934) ("[W]here 'means' is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are those specified in the definition."). For example. Congress uses "only if" in 8 U.S.C. §1226(c)(2), which limits the breadth of the group of noncitizens eligible for release from detention. In 42 U.S.C. § 12655i as well, Congress specifies that participation in government programs "shall be limited to individuals who" fulfill certain prerequisites. That Congress chose no such limiting language here should resolve this issue. As both the legislative history and statutory context indicate that Congress did not intend to preclude non-LPR noncitizens who intend to remain in a district indefinitely from establishing domicile.

**C.  Because Mr. Tanyike's Asylum Application is Pending, He is a Ohio Domiciliary.**

Defendant is correct in that domicile "requires not only physical presence, but also an intent to remain in the forum state indefinitely." ECF No. 10 at 8. However, Defendant is mistaken when it asserts that Mr. Tanyike lacks the ability to remain here indefinitely because he is not lawfully present. *Id*. at 9.

The operative questions here are whether Mr. Tanyike is "lawfully present in the United States and has taken steps under the immigration laws that objectively manifest an intent to make permanent his residence here can claim residence for purposes of the venue statute." *Luna*, 2021

WL 673534, at *2. A pending asylum application, "if granted, will furnish a legal basis to" remain permanently in the United States." *Coyoy*, 526 F. Supp. 3d at 42. Thus, a noncitizen who "currently seeks asylum in the United States. . . is capable of forming such a lawful intent to remain." *Id*. at 36; *see also In re Mendoza*, 597 B.R. 686, 693–94 (Bankr. S.D. Fla. 2019) ("[A]n immigrant legally can form the permanent intention required to establish a U.S. domicile if the immigrant lawfully can reside in the U.S. indefinitely" pursuant to a pending asylum application).

The *Flores* decision is particularly instructive here. In that case, the court found that the plaintiff could chose her venue because as an asylum applicant parolee, she was "lawfully present in the United States" pursuant to the Immigration and Naturalization Act ("INA") and DHS' *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(1) of the Act* memorandum. 108 F. Supp. 3d at 130. Analogously, Mr. Tanyike's asylum application is pending before the BIA. As in *Flores*, this court must first look to the INA to determine if Mr. Tanyike is lawfully present. The relevant INA statute states that "no period of time in which an alien has a bona fide application for asylum pending. . .shall be taken into account in determining the period of unlawful presence in the United States. . .unless the alien during such period was employed without authorization in the United States." 8 U.S.C. § 1182(a)(9)(B)(iii). DHS interprets the phrase "bona fide asylum application" to mean:

> a properly filed asylum application that has a reasonably arguable basis in fact or law, and is not frivolous. If this is the case, unlawful presence does not accrue while the application is pending unless the alien engages in unauthorized employment. **DHS considers the application for asylum to be pending during any administrative or judicial review**.

Neufeld Memo at 29 (emphasis added). As Mr. Tanyike applied for asylum at a port of entry and that application remains pending, he is lawfully present in the United States and has not accrued even a day of unlawful presence. *See* Ex. 1 ¶1. His lawful presence is further supported by DHS, SSA, and Ohio's decisions to grant Mr. Tanyike employment authorization, a social security number, and a driver's license, respectively. *See* Ex. 2. He has therefore demonstrated an "ability under the immigration laws to form the intent to remain" indefinitely just like the plaintiffs in *Flores, Coyoy, Luna,* and *Mendoza* and is consequently domiciled in this district, where he lives.[3] H.R. Rep. 112-10, at 23 n.16.

Defendant argues that Mr. Tanyike's release is irrelevant because parole "was never intended to affect an alien's status." Dkt. 10 at 9 (citation omitted). However, DHS guidance states that parole does in fact affect whether a noncitizen is lawfully present and eligible for work authorization. Neufeld Memo at 11; 8 C.F.R. § 274a.12(a)(4), Certain parolees are also "qualified alien[s]" under Federal Emergency Management Agency regulations and qualify for benefits from the Office of Refugee Resettlement. *See* 44 C.F.R. § 209.2; 5 C.F.R. § 400.43(a)(1). Far from the "undocumented" person Congress sought to bar from establishing domicile, Mr. Tanyike has laid down roots in Ohio with the blessing of the federal and state governments. *See* H.R. Rep. 112-10, at 23 n.16.

---

[3] Defendant also argues that sovereign immunity requires that the domicile issue be resolved in it favor. ECF No. 10 at 9 n.8. However, Defendants cite no case in which any court has found that sovereign immunity, which usually applies in determining subject matter jurisdiction rather than venue, protects the government from suit in the district in which a noncitizen resides. Indeed, *Pennhurst State Sch. & Hosp. v. Halderman*, cited by Defendant, is a case regarding the circumstances under which states can be sued in federal court. 465 U.S. 89, 99 (1984); Similarly, *Reuber v. United States,* another case relied upon by Defendant, concerns whether pendant jurisdiction exists to bring FTCA claims in districts *other than* the ones listed in § 1402(b). 750 F.2d 1039, 1048 (D.C. Cir. 1984). Courts should not "assume the authority to narrow the waiver [of sovereign immunity] that Congress intended." *States* v. *Kubrick*, 444 U.S. 111, 117-118 (1979). For all the reasons listed in the preceding two sections, Congress clearly intended to condition domicile on an individual's capacity to form a lawful intent to remain in the relevant district.

## II.     The Interests of Convenience and Justice are Served by Denying Transfer.

This Court should also dismiss Defendant's discretionary motion to transfer. A court may transfer a case "[f]or the convenience of parties and witnesses, in the interest of justice. . .to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Defendant, as the party seeking to transfer in this case, bears the burden of establishing that the existing forum is inconvenient. *Hefferan*, 828 F.3d at 492. "Where there are only two parties to a dispute." a Plaintiff "should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to  a defendant as to be out of all proportion to plaintiff's convenience, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947).

In determining whether transfer is appropriate, a court considers the following factors:

(1) plaintiff's choice of forum;
(2) the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses;
(3) the cost of making the necessary proof;
(4) questions as to the enforceability of a judgment if one is obtained;
(5) relative advantages and obstacles to a fair trial;
(6) difficulties that may arise from congested dockets;
(7) the possibility of the existence of questions arising in the area of conflict of laws;
(8) the advantage of having a local court determine questions of local law; and
(9) all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir. 1967). Notably, several courts weighing these factors in FTCA cases involving DHS abuses have ruled against similar transfer motions. *See, e.g., Doe*, 2017 WL 4864850, at *2-3 *Alvarado*, 2017 WL 2303758, at *6-8; *Flores*, 142 F. Supp. 3d at 287-91. For the reasons below, this Court should do the same.

13

**A. Plaintiff's Choice of Forum.**

Courts normally afford a Plaintiff's choice of their home venue "great deference because it is presumptively convenient for the plaintiff." *Hefferan*, 828 F.3d at 493 (6th Cir. 2016). Southern Ohio is unquestionably Mr. Tanyike's home as he lives in the district, has spent his entire time free in the United States in the district, and intends to remain there. *See* Tanyike Decl. ¶ 3. Accordingly, this factor weighs in his favor.

**B. Accessibility of Witnesses and Other Sources of Proof, Including the Availability of Compulsory Process to Insure Attendance of Witnesses.**

The second set of factors in this case, which concern the accessibility of evidence and witnesses, weighs against transfer for several reasons. First, Mr. Tanyike's witnesses would be disadvantaged by transfer to Louisiana. Mr. Tanyike's treating mental health professionals will also be located in Ohio once he is able to secure treatment. Tanyike Decl. ¶6. His evaluating physician lives in Cleveland Heights, Ohio. *See* Ex. 3 at 1. Finally, Mr. Tanyike's sister and brother-in-law, to whom he recounted the details of ICE's attack and the hardships he experienced in its wake, live in Ohio. *Id.* ¶3.

Defendant's assertion that defense witnesses are located in Louisiana significantly favors transfer is also mistaken. ECF No. 10 at 12-13. As an initial matter, Plaintiff's counsel can depose all Louisiana witnesses in Louisiana. In addition, depositions by videoconference can mitigate almost all of the burden that Defendant claims that its employees will suffer. Further, as this Court has explained, "[t]he location of witnesses. . .carries little weight given the widespread availability of video conferencing." *Lynn v. Dickenson and Co*., No. 2:21-CV-5004, 2022 WL 610819, at *4 (S.D. Ohio Mar. 2, 2022); *see also Woods v. Brooks,* No. 2:19-CV-5208, 2020 WL 2182983, at *3 (S.D. Ohio May 6, 2020) (denying transfer where depositions could "be taken in person in Florida or by video. And, absent unusual circumstances, there will be little, if any, need

14

for Defendant. . .to travel to Ohio for any court appearance prior to trial."). Moreover, because exchange of documents electronically "is standard litigation practice in the year 2022, the documents' original location is irrelevant." *Lynn* 2022 WL 610819, at *3.

Here, Defendants have not explained why video depositions and testimony would be infeasible, only arguing conclusorily that "[t]he United States is entitled to present in-person testimony." ECF No. 10 at 14 n.9. Defendant provides neither legal support for that supposition nor any reason why any potential witness would be prejudiced by providing video testimony or traveling to Ohio. Indeed, the Court has conducted certain hearings by videoconference due to COVID-19 risk. *See* S.D. Oh. General Order No. 22-06 at 1.

Defendant argues that there would be no witnesses left in Ohio if "Plaintiff's petition for review of his removal proceedings were to be denied and Plaintiff left the state." ECF No. 10 at 12. Mr. Tanyike's case was remanded, with the agreement of the Department of Justice, by the Ninth Circuit Court of Appeals and is under review at the Board of Immigration Appeals ("BIA"). As such he has no final removal order. Even if the BIA decides against Mr. Tanyike, he the right to petition the Ninth Circuit for review of the BIA's decision, or to seek reconsideration from the BIA. See 8 C.F.R. §1003.1(e). Even if Mr. Tanyike exhausted all of his judicial remedies, he would still not be forced to leave Ohio because ICE will not target him for removal pursuant to ICE's own enforcement priorities memo because he presents no national security or public safety risk and entered the United States before November 20, 2020.[4] As such, Mr. Tanyike can make his home in Ohio indefinitely.

Further, courts apply minimal weight to this factor where the party asserting inconvenience is the government because the government can compel its witnesses to testify.

---

[4] Alejandro Mayorkas, *Guidelines for the Enforcement of Civil Immigration Law*, Dep't of Homeland Sec'y, Sep. 30, 2021, https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

Here, the witnesses listed by Defendant are either employees of Defendant, or in the case of WCC's nurse, Defendant's contractor. ECF No. 10 at 12. Leaving aside the fact that Defendant has not identified any witnesses that it believes will not testify, it can compel any intransigent witnesses to do so. *See Alvarado*, 2017 WL 2303758, at *7 ("As federal employees, these witnesses may be compelled to testify by the Government."); *Lynn* 2022 WL 610819, at *4. ("[T]he location of witnesses who remain employed by Defendant is not properly considered, as employers are presumed to be able to compel their appearance in any appropriate forum"). Finally, Federal Rule of Civil Procedure 45 "was amended [in 2013] to allow nationwide service." *Miller v. Ghirardelli Chocolate Co*., No. C 12-4936 LB, 2013 WL 6774072, at *5 (N.D. Cal. Dec. 20, 2013). As a result, this Court can deal with the problem of third-party witnesses who are unwilling to testify if and when it arises by commanding them to do so via videoconference within 100 miles of their home. *See* Fed. R. Civ. P. 45(c)(1)(A). Accordingly, this factor also weighs against transfer.

### C. Cost of Making the Necessary Proof.

As Mr. Tanyike and United States' resources differ dramatically, this factor weighs in favor of honoring Mr. Tanyike's choice to sue in his home district. Transfer is disfavored when it would simply shift the inconvenience from one side to the other. *See Lockhart v. Garzella,* No. 3:19-CV-00405, 2020 WL 6146598, at *5 (S.D. Ohio Oct. 20, 2020) (Where "there is a significant disparity in the relative means of the parties… this factor weighs against the requested transfer.");*see also Staggert v. Team Oil Tools LP,* No. 2:16-CV-822, 2017 WL 2189558, at *3 (S.D. Ohio May 18, 2017). Furthermore, "any documentary evidence related to the matter can be reproduced and transmitted electronically," and as noted above, the cost to Defendant will not decrease dramatically with transfer as the parties can use videoconferencing to eliminate the cost

of travel. *Alvarado*, 2017 WL 2303758, at *7. Notably, transfer is inappropriate in situations like this one in which a party puts forth no specific evidence regarding potential litigation costs. When a party moves for change of venue based on inconvenience , the party should provide specific evidence of that inconvenience. *Union Cent. Life Ins. Co. v. Anchor Fin. Servs.*, LLC, No. 1:10-CV-95, 2010 WL 5566827, at *2 (S.D. Ohio May 21, 2010), *report and recommendation adopted*, No. 1:10CV95, 2011 WL 94562 (S.D. Ohio Jan. 11, 2011).

While the government can draw on a nearly limitless pool of resources, there is real risk that financial considerations will prohibit Mr. Tanyike from traveling to Louisiana to litigate this case. He is currently unemployed and relied on the kindness of his sister and brother in law for all of his life expenses. *See* Tanyike Decl. ¶4. As Mr. Tanyike expects his financial situation to remain unchanged in the near future and his family lacks the resources to pay more of his expenses, he may not be able to afford a plane ticket, transportation, and lodging in rural Louisiana, which lacks substantive public transportation infrastructure.[5] *Id*. ¶5. He does not have a car and may not be able to afford ground transportation to Louisiana either. *Id*.

### D. Relative Advantages and Obstacles to a Fair Trial.

Transfer to Louisiana would take Mr. Tanyike away from the mental health care necessary to cope with the aftermath of ICE's attack, for the duration of any trial. *Id*. ¶6. Furthermore, return to Louisiana would risk retriggering Mr. Tanyike's PTSD, which continues to cause him insomnia, restlessness, loss of appetite, memory loss, anxiety attacks, and intrusive thoughts and nightmares of ICE chasing him. ECF No. 1 ¶¶ 31-32. Returning to the scene of a traumatic event can trigger additional PTSD symptoms, and those symptoms affect a witness'

---

[5] *See* Transportation Rankings, US News and World Report, accessed Dec. 9, 2021, https://www.usnews.com/news/best-states/rankings/infrastructure/transportation.

ability to testify accurately.[6] Dr. Lederer opines that those who have their PTSD triggered "often are not able to make rational decisions, focus or advocate for themselves" and that "returning Mr. Tanyike to Louisiana for trial would be [] a triggering experience" and that Ex. 3 at 3. As forced return to Louisiana risks exacerbation of Mr. Tanyike's PTSD and therefore the ability for him to testify competently, the interests of justice favor denial of Defendant's motion. *See Luna*, 2021 WL 673534, at *3 ("[W]here the evidence shows that the financial, logistical, and health challenges associated with a transfer would likely make it impossible for plaintiff to pursue his claims, the government has not met its burden.").

### E. Difficulties that May Arise from Congested Dockets.

Defendant claims that "the docket in the Southern District of Ohio is currently more congested than the Western District of Louisiana." ECF No. 10 at 15. However, the while courts in this district are more congested by some measures, it is less so by others. For example, Defendant fails to mention that as of December 31 2021, the Western District of Louisiana has an average 813 filings per judge and compared to 779 in this district.[7] Likewise, 10.4 percent of cases have been pending for more than three years in the Western District of Louisiana compared to 6.4 percent here. Case counts in the Western District of Louisiana have risen since 2019 while decreasing significantly here.

Finally, this Court has repeatedly discounted using pending case statistics as a reason for transfer out of this district because "this Court is currently handling one of the largest multidistrict litigation cases in the country: *In Re: Davol, Inc./ C.R. Bard, Inc., Polypropylene*

---

[6] *See* Mary Jo DiLonardo, *What Are PTSD Triggers?*, WebMD, May 15, 2021, https://www.webmd.com/mental-health/what-are-ptsd-triggers; Landy F. Sparr and J. Douglas Bremner, *Post-traumatic Stress Disorder and Memory*; Journal of the American Academy of Psychiatry and the Law Online March 2005, 33 (1) 71-78; http://jaapl.org/content/33/1/71 ("Evidence from a variety of studies has shown a relationship between PTSD and deficits in explicit memory function.").
[7] *See* U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (Dec. 31, 2021), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2021.pdf.

*Hernia Mesh Products Liability Litigation*, 2:18-md-2846," thereby skewing backlog statistics. *Olin-Marquez v. Arrow Senior Living Mgmt.*, LLC, No. 2:21- CV-996, 2022 WL 479781, at *14 (S.D. Ohio Feb. 17, 2022); *see also Lynn* 2022 WL 610819, at *5. Thus, the statistics Defendant cites do little to nothing to support its transfer motion.

   **F.   Advantage of Having a Local Court Determine Questions of Local Law.**

   Defendant argues that this case should be transferred so that a Louisiana district court may apply substantive Louisiana law. ECF No. 10 at 14. However, as noted in one case cited by Defendant, application of state law by an out of state district court is a factor accorded little weight where the legal issues involved are not novel, complex, or unique. See *Kendle v. Whig Enterprises, LLC*, No. 2:15-CV-1295, 2016 WL 354876, at *9 (S.D. Ohio Jan. 29, 2016); *see also*, *Flores*, 142 F. Supp. 3d at 290 ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex. The court can ascertain Texas law with help from counsel.").

   Defendant infers that Louisiana's Civil Law history inhibits this Court's ability to apply Louisiana laws. ECF No. 10 at 14. However, the Louisiana law to be applied here is neither complex or uncommon. The primary claims in this case, battery, intentional infliction of emotional distress, are functionally identical in Louisiana and Ohio. In Ohio, a defendant is liable for civil battery when "he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99 (1988). Similarly, in Louisiana a defendant is liable in cases in which there is "harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts,* 512 So. 2d 389, 391 (La. 1987). In Ohio, a defendant is liable for infliction of emotional distress if "(1) the defendant intended to or recklessly caused the plaintiff serious emotional distress; (2) the defendant's conduct was extreme and outrageous; and (3) the defendant's

conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410 (1994). Analogously a defendant is liable in Louisiana if the plaintiff establishes "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Company*, 585 So.2d 1205, 1209 (La. 1991). Both states' definitions for and subsequent judicial interpretations of these torts rely heavily upon sections 13 and 46 respectively of the American Law Institute's Restatement (Second) of Torts. Therefore, despite Defendant's protestations about the vagaries of the Napoleonic Code, this Court is capable of applying the same tort law that it does in Ohio cases.

Finally, to the extent that Louisiana has an interest in adjudicating this case, that interest is outweighed by the federal nature of the claims against the United States here. As other district judges have explained, "[i]mmigration, and the treatment of those who have entered the United States without inspection is a matter of national concern."*Alvarado*, 2017 WL 2303758, at *8; *Doe*, 2017 WL 4864850, at *3. Any claims of mistreatment by immigration officers equally impact Ohio and Louisiana. Thus, like other courts to consider this factor in the immigration context, the Court should accord no weight to Defendant's public interest arguments.

### G. All Other Considerations of a Practical Nature That Make a Trial Easy, Expeditious And Economical.

Defendant argues that one of Mr. Tanyike's counsel's location in Louisiana favors transfer. However, the "location of counsel is an 'improper consideration' in the section 1404(a) analysis." *Torus Specialty Ins. Co. v. Selection Mgt. Systems, Inc.*, No. 1:15-cv-755, 2016 WL 776614, at *3 (S.D. Ohio Feb. 29, 2016).

Finally, Defendant argues that transferring the case to Louisiana "would favor the interests of efficiency and finality" because the case would begin anew if Defendant prevailed on appeal. ECF No. 10 at 13. However, though Defendant cites Wright and Miller's Federal Practice & Procedure treatise, it neglects to mention that appellate reversal of a district court order "**granting or denying**" a motion to transfer "will require re-adjudication of the entire case." *See* § 3855 (4th ed.) (emphasis added).

In addition, Defendant overstates its chances on appeal. Given the overwhelming body of case law detailed above declining to transfer the cases of plaintiffs situated similarly to Mr. Tanyike, the greater risk of reversal lies in granting the motion. And even if Defendant appealed an order denying transfer upon final judgment, the Sixth Circuit would review that order under a deferential abuse of discretion standard. *See Moses v. Bus. Card Exp., Inc.,* 929 F.2d 1131, 1137 (6th Cir. 1991). Accordingly, this factor does not cut in favor of the Defendant. Finally, taken together, the balancing of the applicable factors in this case weighs strongly against transfer.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss or transfer this action to the Western District of Louisiana.

Dated: March 28, 2022                                    Respectfully submitted,

                                                          /s/ Jeremy Jong
Brian Hoffman                                             Jeremy Jong
OCSILiO: The Ohio Center for                              Al Otro Lado
Strategic Immigration Litigation & Outreach               3511 Banks Street
P.O. Box 181247                                           New Orleans, LA 70119
Cleveland Heights, OH 44118                               Telephone: (504) 475-6728
Telephone: 330-539-3932                                   Email: jeremy@alotrolado.org
Fax: 330-362-2134
E-mail: brian@ocsilio.org                                 *Pro Bono Counsel for Plaintiff*